and Mr. Waldman is here for the appellate. Ms. Galleon is here for Schumacher and Mr. Walsh is here for HMA. Mr. Waldman, you may begin when you're ready. Good morning. May it please the court. Sorry, a little loud. My name is Glenn Waldman and I have the honor of representing Dr. Pamela Perry. Dr. Perry was a rock star in the medical world with excellent credentials who agreed to go into an underserved area to do what she did well. And based on all metrics that are in this record, she did a really good job. Nonetheless, she was discriminated against in numerous ways and had her civil rights trampled on. She should be afforded the fundamental right for a jury to decide her claims one way or the other. The merits of their conduct and the law all support reversal so a jury can do what they're supposed to do. But if she's an employee, she's got a Title VII claim, but not if she's an independent contractor, right? 100% correct, Your Honor. Well, the district judge says she's an independent contractor. Yes, he did. Respectfully, we believe he got it wrong for many reasons. Was there an issue? Is that a legal issue or a factual issue? That is an issue that this court has dealt with on so many occasions I can't count them all. That is an issue to be dealt with by this court as to whether or not it's de novo. The standard review is de novo, Your Honor, as to whether or not he got it right relative to whether she's an employee or an independent contractor. Why should we, if we were to consider that as a legal rather than a factual issue, why should we ignore her own testimony that she was an independent contractor? Her testimony was that the agreement she entered into was an independent contractor. However, that's what she signed. But in terms of the control and the case law, which makes it very clear that the court's supposed to look at the totality and the means and the method of control, that's what it was. And when she went into it, I mean, the woman's an honest woman. She signed the agreement and said independent contractor. But this court has the right under the law to look at the totality of the circumstances to consider what she said as well as the label contained within the agreement. But itself, it's not sufficient itself as the test from all the cases are that it's supposed to be a hybrid. You're supposed to look at the control, the working relationship, the totality, and the means and manner and method of the control. That's what's supposed to be looked at. Let me add, Mr. I understand what you said in response to Judge Wilson's question. Sure. Our review is de novo because it's a summary judgment. Correct. But it's a, it can be a disputed factual issue whether someone is an independent contractor or an employee. I agree with that, Your Honor. Yes, sir. All right. I agree, absolutely. It can be. It can be a disputed factual issue. But the law is very clear that the court is supposed to make every inference in favor of my client in terms of dealing the suit. The non-moving party. The non-moving party. Of course, it's fundamental. We learned that the first day of law school. Well, maybe the second day. But the point is here, the order, the judge missed so much. And if I'd like, I'd like to walk you through the 22 things that establish mean method and control, if I may. Can I, can I actually ask you to organize it perhaps a little bit differently? I think the district court said that five of the eight factors from Cobb versus Sun, Sun paper suggested a finding of independent contractor. Which, which of any of those five categories do you think the district court got it wrong on? Or, or at least do you think there's a disputed issue of fact on? The method of payment. The type of, the method of termination. The type of employment benefits controlled. The manner in which, and the right of control. Really, the primary one, I think, is right to control, frankly. Because that really is what the law is, is you look at these factors, but at the end of the day, it really comes down to means and manner of control. Who is controlling the situation? Whether you are truly an independent contractor making your own decisions, or really you are bound by the company to do what they ask you to do. And here there are so many, and that really, you look at the factors, but at the end of the day, again, the law seems to be, it is, that you must examine the totality of the working relationship and the means and manner of control. So, let me walk through them, if I can, for your honor. And I'll put them in the categories as I go through, if that's okay with you. Sure. Please. So, first and foremost, Dr. Perry agreed to work full time for Schumacher. She agreed to make the medical care of emergency department patients at Pine Ridge her greatest priority. She agreed to avoid all other activities which would conflict with her obligations to that care. So, right off the bat, full time. But she could work elsewhere. I'm getting there, but respectfully, Judge, she couldn't unless she could have cloned herself. Because, one, she had to non-compete. And, two, based on the requirements and the obligations she had to HMA and Schumacher to be there, not only for her hours, but to have office hours and do all the things she had to do, it would have been impossible for her to do more than that. And based on the non-compete, which is Section 5.06, she couldn't do it anyway. So, that really is kind of, it just doesn't exist. It's illusory, respectfully, that she could have worked elsewhere. She could not have worked elsewhere. She just couldn't because there was no time in the day or night for her to fulfill the obligations and the control that they had over her. The payment arrangements. If that were the case, wouldn't that mean that anyone who had an independent contractor position for, say, 60 hours a week, automatically would not satisfy that factor? It seems to me that it's got to be more than that. I think that's fair. And I think the non-compete portion of it goes hand in hand with that that makes it difficult. But I agree with you. If it was a loan, just you had a lot of hours a week, would that turn an independent contractor necessarily into an employee? Possibly not. I mean, that's a serious something that needs to be considered because we can't work 24 hours a day. So, let's be realistic. But some of us try to sometimes. But, you know, 60 hours is 12 a day times 5. That's a lot. So, is it possible that that should not be of itself enough? Yes, Your Honor, I agree with you there. Can I ask you one question? I know you want to get back to these factors. I do. It's going to take a while, so I want to make sure that I get a chance to ask you this question. Sure. Can you explain why your client chose not to pursue her viable Section 1981 claim? The one claim that remained? Right. Because it was only against one party, and we felt at that point that it was better to see if we could. These claims to us, there was a lot more meat on the bones relative to these claims than the one claim against the one party. You still have the 1981 claim against Schumacher. We had it, but it's gone. I mean, everything's gone at this juncture. Well, yes, we had it, but it had to be dismissed so we could come up here for these claims, sir. No, the claim against Naples HMA was dropped in the Fifth Amended Complaint, but the 1981 claim against Schumacher resulted in a summary judgment. Correct. So we lost that one. That's correct. But isn't that on appeal? Yes, it is as well. That's what I mean. I'm sorry. That 1981 claim is not gone. That's up for our review, right? Absolutely. I'm sorry. I misspoke. One was up for review before this Court. The other was dropped. That's correct. So, yes, summary judgment was granted. That's why we didn't have both. We felt it made sense to come up here. It was a strategic decision, is what it was, Your Honor. May I proceed? I didn't say it was going to take a while. Okay. All right. Moving forward. Payment is another important indicia. Under the Demers case, she received hourly pay plus incentive compensation, which was completely and totally dictated by HMA and Schumacher. She had no say in that. It was controlled by them. She used their computer, attended weekly meetings, had to publish her schedule and conduct regular meetings and provide an administrative weekly update, all of which under Demers are important factors of control. Now let's talk about the business side because I think that's critical, judges, as to this. She was required to seek, to Schumacher, control over the business side of her medical practice. She had no control over the kind of payments to take, Medicaid, whatever. She had no control over that. No participation in which reimbursement programs were to be used. Agreed that Schumacher would negotiate with these entities, not her, and that she had no right to accept or reject these terms. They were dictating how she was going to be paid, which companies they were going to get monies from and how it was going to work. And she transferred all rights to receivables to Schumacher, which under Garcia is another important element. So financially, she had absolutely zero control over her practice. And the cases are cited by the Applees, the Ashkenazi case, the Alexander case, and cases like that. They're all scenarios where the doctor had control over his financial part of the package. She had zero control over the financial aspect. She had no financial autonomy. All receivables, if she left, all receivables belonged to Schumacher. They also determined, like I said, how much money she was to receive and had the discretionary bonus. She had no ability to compete with Schumacher. 5.06 of the medical agreement is the non-compete provision, which we talked about a little bit, which makes it clear that she could not engage in any other activity which would be in conflict with her obligations here under, i.e., if she's working somewhere else. It's in conflict. She could not work elsewhere. So if she was a superwoman, which, by the way, she was, and worked 60 hours a week here, even if she could find another 30, she couldn't have done it based on the way they tied her down. What provision specifically? 5.06 of the medical directive agreement. Doesn't that provision say that it is not intended to preclude a physician from working on the staff of any hospital or engaging in the practice of medicine? That's what it says, but it also says you can't do anything that would be in conflict or obligations here under. I mean, realistically, if you go to work at a competitor's place, they're going to say, uh-uh, this is against us because you're. So even though it's there, again, this is more trying to cover themselves, but the reality of what it says is she can't work somewhere else. That's the way I read it. I mean, if you read that and if somebody comes to you and says, can I go work there, the answer is you're going to have a problem because they're going to enforce it. So I believe that if she tried to work somewhere else, it would have been problematic under 5.06. Now HMA made the request to remove her from her duties at Pine Ridge, right? Yes, sir. So how can Shoemaker be held responsible for a termination then? Shoemaker had an obligation. Well, first off, the environment that she was in was a hostile environment, number one. Number two, we have the situation here where we have the disparate treatment that she received, and it really was hand-in-glove Shoemaker and HMA. The agreement between Shoemaker and HMA said, you know what, you have to tell us about any problems that occur, any discrimination or anything. Shoemaker told Dr. Perry, you don't tell HMA. You tell us. You're not to tell them about these problems. You're supposed to tell us. We don't want to jeopardize our contract. That was the testimony that's in this record. You don't do it. And she didn't. She abided by what she was told by Shoemaker, the party that she contracted with. They put her in an untenable position. She did what they asked her to do. And then when it's time, and a terminator, on the one hand HMA says, well, gee, we didn't know that there was discrimination. And then Shoemaker says, well, gee, we told you that there was discrimination. There was an issue. No. So one of them is wrong. They told him or they didn't tell him. There was no investigation done. And the HMA – sorry, I know you want to ask me a question. I just want to get this one little thing – go ahead, ask me a question. Well, I think I understand your answer to that question. Let's assume that she's an employee and she has a Title VII claim. Yes, sir. Where's the evidence in this record of a comparator for her race and gender claims? If I may, this is – and this is so important. Dr. Childress, there were two hospitals, Pine Ridge and Collier. Dr. Perry was at Pine Ridge. Dr. Childress was at Collier. Dr. Childress was a white male. She was an African-American female. His numbers were lousy. Her numbers were really good. This was the metrics, and this was in the complaint that's in the record. He had communication problems. Presumably, purportedly, that she had communication problems. They gave him eight months to try to figure out and fix the communication problems he had. They didn't give Dr. Perry anything. She told him about it. She told him about the issues two months before and one week after she used the D word, discrimination. Guess what? She got fired. Not only that, he was so bad that she had to do his job. They asked her to write certain criteria and credentials for his hospital because he couldn't do it. White man, African-American woman, he's lousy. She's really good. She's killing it. He isn't. He gets eight months. She doesn't get anything except a kick out the door. That's the disparate treatment, and that is right on point. I see my time is over. We got your argument, Mr. Wallman. Thank you. I appreciate it. Ms. Gallian. Sorry. Good morning, Your Honors. May it please the court, counsel. I'm Teresa Gallian. I have the pleasure of representing what we call the Schumacher Group of Defendants. If I may, I'd like to address first the suggestion of Judge Hinkle that there is a Section 1981 claim against my client. Respectfully, Your Honor, there is not. In this particular case, the operative pleading on which the final judgment was based at the district court level is the Fifth Amended Complaint. Yes, but let me tell you, I'm a district judge. Yes, sir. It happens too many times to count that there's a complaint. It's got three counts. There's a motion. I dismiss one of the counts. I grant leave to amend. If the plaintiff comes back and repleads the count that I just definitively rejected, the plaintiff is not going to be received well. Once I have definitively ruled, I have definitively ruled, and it is a nightmare for everybody if the same claim gets put back in additional amended complaints. The judge granted summary judgment on the 1981 claim, finding there were no disputed facts. I'm not sure how that finding could be made because it seems to me the record is full of disputed facts. But once that summary judgment is entered, it's not immediately appealable. There's no 54B judgment. That ruling is appealable when the Rule 58 judgment is entered at the end of the case. That's where we are now. What's wrong with that analysis? I do agree with that analysis. In this case, however, the shenanigans surrounding the Section 1981 claim that constituted the first appeal to this court and then the second appeal, this is our third trip here in a seven-year-old case, were all over the plaintiff's voluntary actions with regard to the Section 1981 claim so that it's become a zombie claim in this case. We were here on round two because of her improper efforts, at least that was the finding of the first panel, to manufacture appellate jurisdiction. But by entering the stipulation that you agreed to. It's hard to blame them for the shenanigans when you signed the stipulation. But so they were wrong. They didn't get to appeal it then. Why don't they get to appeal it now? But, Your Honor, I would respectfully ask that you keep the defendants, the appellees, separate. We were not a party to this stipulation. The Schumacher Group defendants had already been dismissed in the case. We didn't have anything to do. We were out. The stipulation is between Mr. Walsh's clients, the HMA defendants, and Dr. Perry. They were one day away from trial before Judge Steele. My clients were safely at home back in Tampa. We had no involvement in that stipulation. So I do think that before there is final consideration of this issue of the 1981 claim, we need to keep the appellees separate because our standing is very, very different. And in any event, our position is that there is, even if we reached the Section 1981 claim on the merits, in this case with regard to the Schumacher defendants, the following are undisputed. No evidence of race discrimination. No evidence of sex discrimination. All of the record evidence established that Dr. Perry was supported by, admired by, and respected by everyone at the Schumacher Group. All of the evidence, or so-called evidence in this case, involved HMA employees, HMA's nurses. My client had four business days from March 22 of 2012 when it learned of Dr. Perry's concerns about race discrimination to do something before she was fired by HMA. Four business days. Let me ask. You had been told that she had been the subject of racial discrimination, that the nurses, Hamilton and the others, had made false claims against her on a racial basis. There's evidence that you told that to Naples HMA. Naples HMA said, fire her. So you know that there is a pretextual explanation being given that there is a reason to believe it's based on race, and you fire her. And you say that's okay. I do not agree with that sequence. In fact, it's undisputed in the records, Your Honor, that my clients first learned on March 22 at a dinner with Dr. Perry, and they asked, they said, please tell us more. Which nurses? What are the details? And, in fact, one of the vice presidents of Schumacher, and this is in the appendix document 90, page 324, line 17 through 23, Marty Anderson sends an email to Dr. Perry, I'm still bothered about your comments that Bobby Hamilton has been making derogatory racial comments about you. I know that you promised not to give us the names, but I really feel that it's necessary to bring this forward. It absolutely cannot be tolerated, and I feel strongly, and we need to have this investigated and handled. Would you reconsider? There should be no threat to the parties that either heard the comments or were told the comments. They would be protected. And the response of Dr. Perry is, I am simply not in a position to provide this specific information. So we now suffer the cheekiness of Dr. Perry's claim that we did not adequately investigate under circumstances where we had four business days to do so, and Dr. Perry said, I'm not providing you the names of potential witnesses, I'm not cooperating in your investigation. So the defendants in this case are radically different. There's no pretext by the Schumacher Group. We were signatories to an exclusive agreement with HMA, which, by the way, is customary in the hospital business. Let me slow you down and ask you this. If Naples HMA had come to Schumacher and said, Dr. Perry's doing a good job, but we've got nurses that will not work with an African-American woman. We need you to remove her. And Schumacher said, My agreement is I have to do what you say. She's fired. Who wins that case? In that case, we have a duty to place HMA on record that we believe racial discrimination is involved, that we have a duty to investigate and to look into it. However, let's take a look at the realities. She is working at HMA's hospital. They own those premises. Those are their patients. Let me just tell you that if a jury could find that this case is just like my hypothetical, then, frankly, I think your argument that she wouldn't tell us who she heard it from, I think that goes nowhere. If you have, if the jury could find that you knew the reason Naples HMA said get rid of this doctor was because she's African-American, I don't think you've got any defense. We didn't know that, Your Honor. We knew that Pam Perry said these people treat me disrespectfully because of my race. It's undisputed in the record that she never mentioned gender. The first appearance of a gender claim was actually in the first complaint. But she did. She said, I believe that this is racial. But she did not give any examples, and she would not give any names or any evidence. Let me set this analysis up for you the way I think it gets analyzed and where I think the failure to investigate comes in. I think it's a cat's paw case. When you have a person with racial animus, nurse McCown or Hamilton, and they make a false allegation out of racial animus intended to get somebody fired, and it works because nobody investigates, then they've got a claim. That's the Staub case in the Supreme Court, and there are some Eleventh Circuit cases. So when you say we didn't have enough time to investigate, I don't think you helped yourself. I think the fact that you insist that you did not investigate makes the cat's paw case. Your Honor, we were hampered in our ability to investigate by the sworn testimony that was confirmed by Dr. Perry that she declined to provide any information. My clients could have gone through the motions of an investigation, but let's take a look at the milieu. The milieu is this is somebody else's hospital. These are somebody else's employees. We placed HMA on notice under Title VII. That was our duty, and therefore under Section 1981, which would follow Title VII law, that was our duty. We did place them on notice. Their comment was she can't work here. Get her out of here. Remove her. We have an absolute right in the contract. So I believe that we had no ability practically or legally to say, no, she'll be here tomorrow. You must keep Dr. Perry. You must let her see patients. That's just foolishness. But we could have placed her elsewhere, and we promised that we would do that, and she declined the offers. All of this is undisputed in the record. We made other offers to her. She was, to put it in the vernacular, our prize pony. We had this Yale-educated African-American female doctor. She was the best thing the Schumacher Group had ever had, and we said don't worry. And you fired her anyway. We didn't fire her. We said we'll remove her. We can't stop you, HMA, from not permitting her. We're a recruitment company. We don't own the hospital. We don't. The patients are not ours. We are a recruiter, and we placed her. Customer preference went out as a defense to racial discrimination cases in the mid-'60s. I'm familiar with the airline cases. In fact, I love the airline cases, which established that customer preference is not a defense to a Title VII case. Many of us remember the old Texas Air flight attendants who wore hot pants and their claims that went to the United States Supreme Court that customer preference would not require them to be treated from the male flight stewards. This is not a customer preference case. This is a contractual rights case. But if I may, I can see that I have used everyone's time. I did want to point out that even if you find she's not an independent contractor, there is no evidence establishing that my client engaged in intentional race or gender discrimination against Dr. Perry. And we should not lose sight. That's what Title VII requires, intentional discrimination. Her testimony about Vice President Miss Anderson, Vice President Dr. Carlson, and the head of nursing for Schumacher, Kathleen Thousand, the only people that she interacted with was they were respectful, they treated me well, they never discriminated against me. She was their prize pony. They attempted to place her elsewhere. They were powerless contractually and practically to direct HMA to continue to employ in HMA's hospital, seeing HMA's clients. That is not pretext, Your Honor. That is simply the reality of the relationship between these parties. All my client could do was place the very qualified Dr. Perry somewhere else, something that she refused to tolerate. And I know that I'm well out of time. Is there anything else that I should address at the request of the Court? I think we have your argument, Ms. Gallia. Thank you. It's a pleasure. Thank you, Your Honors. And Mr. Walsh, you're here for HMA? That's right, Your Honor. And our position is very simple. There's no way to reach any merits against HMA because the plaintiff, appellant, in their opening brief failed to develop any kind of argument against Naples HMA. And, in fact, today has not directed our argument toward Naples HMA. And under the clear rules of this Court, Rule 28, appellate rule, she has not set forth any legal theories, developed them, argued them, not talked about the elements of the legal theories against Naples HMA, has not shown what evidence or proof in the record relates to those elements, and has not discussed cases or authorities that would support any conclusion in their favor that she wants this Court to draw. It's just silent. There's no 1981 claim. In her brief at pages 26 and 27, she says that she was an employee of Schumacher, and so she can recover against Naples HMA under a ZACLAMA. And at another place she cites Pardazi. That's the theory. I mean, that's the theory why the Court was wrong below is because, I mean, they agree. If she's not an employee, you win. But if she's an employee, then under ZACLAMA, you can be liable for causing her to be let go. Well, she doesn't explain that. She cites it for functory reference. And I would call attention to the case last year, the Kellner case that Judge Wilson was part of, which I've read the brief in that case, and that was much more developed, and yet the Court said that was insufficient to get to the merits. That was a case involving a passenger on a cruise ship. She slipped and fell, had a negligence claim. And there were two elements that the District Court said were insufficient, causation and damages. On appeal, she only argued about causation, not damages. Of course, they're not going to deal with any of the substance because she has failed to present an argument. And that's exactly what's happened here, both in the brief and today before this Court. I mean, I guess I'll give you one more chance to answer my concern about it. The reason they lost the 1980 Title VII claim against Naples HMA was because she's an independent contractor, so she has no Title VII claim. Right. She argues in her brief that's wrong. She is an employee, so she has a Title VII claim. I guess you're marked. So how much more? I mean, frankly, I've read hundreds of pages this week, and if I'd read a tenth as many, it would have been about as good. I understood the argument. How much more would you have him say? Well, if she had discussed this in her brief, I would respond and say she has to have a— if we're not her employees, she doesn't claim that we're her employer or joint employer, Naples. And so what's the connection between their being an employer? Well, maybe there's an interference with contract. No, no. It's Zeklema. Zeklema is the case. I mean, it's an 11th Circuit binding case where it's a hospital and a doctor, and if the hospital denies the privilege and gets the doctor fired, the hospital can be liable. That's this case. Well, she did not discuss that. She just threw it out. And I think the burden of Kellner is you cannot use—just throw out a case without a discussion or identifying what the cause of action is. I'm not clear what her cause of action is against us. She mentions Title VII at one point, just Title VII, throws it out there, and she mentions interference at some point. But interference is not something she ever pled through seven years and six complaints. She's never mentioned interference until now. I didn't understand the interference. I understood the theory to be she worked at this emergency room one day. The next day she didn't work there. The reason she didn't work there anymore is because she's African American, and the person who made the decision was your client and communicated it to Schumacher, and Schumacher carried it out. That seems to me to be a pretty straightforward Title VII case. Zaklama answers the question of whether the hospital that gets the doctor fired can be held liable under Title VII. Well, you've written a very good argument for their side, but they didn't like that argument. Their argument against us is bereft of any reasoning or discussion, and it gets back to Kellner. We cited 18 cases of this court that say, unless you develop an argument, you've waived it, you've abandoned it, and they've not responded. In their reply brief, they didn't mention any of those cases. They had no answer for that. So I don't see how you reach any kind of merits against my client. Again, today, as I said, he didn't argue anything, didn't develop an argument against my client. He's all about Schumacher. Now, I'm not obligated to create his argument for him and create this drama and then answer it, nor is this court obligated to come up with their arguments for them. You'd probably prefer it if I didn't try to do that. Thank you. All right. Thank you, Mr. Walsh and Mr. Wallman. You've reserved some time for rebuttal. I did, Your Honor. Thank you very much. Very few points to address. Ms. Galleon said that there was no intentional discrimination. They didn't even try to investigate. They didn't even make an effort. Supposedly, they told HMA, but maybe they did, because HMA says they were never told. So for them to say, we didn't do anything wrong, it was incumbent upon them under their contract with HMA and under the law to do something. They did nothing. So for them to say, and to call Dr. Perry a prize pony, I'm not going to go there, but they had an obligation to do something, and they did nothing. Maybe they told HMA, maybe they didn't. If they did tell HMA, that sure as heck implicates them a lot more than they want to say, to your point, because then they didn't do it. And the testimony in this record is HMA said, if we knew, we would have handled this very differently. That's what one of their executives said under oath, which is in this record. Why did HMA say that they were firing her? They said it was for communication issues, her inability to communicate. Again, we went with Dr. Childress, who got eight months to try to figure it out. This person was having meetings every week. She was doing all these things to communicate, and their metrics were the best they had ever been. They were number one in the entire HMA system, number one. So that was the pretext was communication, which is absolutely ridiculous, respectfully. I'm not going to disagree at all that the circumstances sound extremely, extremely concerning, but it sounds to me like Naples was the one who took the action and who had the employees. If there's a cat's paw theory, why doesn't it go to the management at Naples rather than to Schumacher? Schumacher was the party that she contracted with. Schumacher had the obligations to Dr. Perry. Schumacher is the one who told Dr. Perry, don't tell HMA if there's a problem. It's unroboted. Don't tell them if there's a problem. But it was their responsibility to their employee, to their contracted individual, to do something. They didn't do it. They did nothing. The problem with that argument, though, potentially, is that if you're arguing that Schumacher is who she was contracting with, that threatens some of your employee rather than independent contractor arguments. Can you have it both ways on that? I'm not sure I agree with you respectfully. That's why I'm asking you. Cool. I think you can because the agreement says what it says. It says this is an independent contractor agreement, but that's not the test for this court to determine. You have to look at the totality. If it determines that she was acting as an employee, then regardless of that, there are still obligations that attach. But regardless of what it says, yes, you look at it as an employee. So I guess to some extent you do have it both ways, I guess. For all the reasons that have been stated here today, and it is a tag-along. HMA is a tag-along. If we're good against Schumacher, we're good against HMA. I don't think we need to go any further than that. We would ask that this court reverse and let us get back and let the jury make this decision one way or the other and let her have her day, which she deserves. Thank you very much for your time. All right. Thank you, counsel. And the next case is Richard Harrison v. Macy's.